CROWE v. MALBA LAND CO. et al.

HARRIS v. SAME.

(Supreme Court, Special Term, Queens County.   May 13, 1912.)

1. MORTGAGES (§ 415*)—FORECLOSURE—FRAUD—PERSONS ENTITLED TO ALLEGE.
   A realty company purchased land, taking a deed in the name of its clerk, who executed a mortgage to the realty company, and afterwards conveyed the land to certain persons as trustees of a syndicate which the realty company procured to purchase the land. *Held*, that the grantees of the clerk could resist foreclosure of the mortgage on the ground of fraud by the realty company in procuring its execution by false statements to them as to the validity of the mortgage.
   [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1210–1224; Dec. Dig. § 415.*]

2. MORTGAGES (§ 275*)—TRANSFER OF PROPERTY—RIGHT OF PURCHASER TO CONTEST MORTGAGE.
   A grantee who takes subject to a mortgage is estopped from attacking its validity, if he assumes payment of the mortgage or the deed expressly recognizes it either by name or in amount, but if he merely takes the land subject to liens and incumbrances generally, as where the deed recites that it is subject to "liens and incumbrances of record," the grantee may show that a mortgage of record is void for fraud.
   [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 772–781, 1218; Dec. Dig. § 275.*]

3. MORTGAGES (§ 434*)—FORECLOSURE—PARTIES.
   A grantee of the purchaser from the mortgagor who has transferred his interest in the mortgaged property, and has no further interest therein, is not a proper party to an action of foreclosure.
   [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1272–1287; Dec. Dig. § 434.*]

4. MORTGAGES (§ 86*)—FRAUD—ACTS OF AGENT—EVIDENCE.
   In determining whether a mortgage was procured by fraud, the acts of the mortgagee's clerk, who took title to the property purchased by the mortgagee and executed the mortgage sought to be foreclosed, as well as those of the mortgagee's general superintendent of agents, who worked up the sale to others subject to the mortgage, within the scope of his authority, are considered the acts of the mortgagee.
   [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1350, 1355, 1364; Dec. Dig. § 86.*]

5. MORTGAGES (§ 463*)—ACTS OF AGENT—EVIDENCE.
   Evidence in an action to foreclose a mortgage on property purchased in the name of a clerk of the mortgagee who afterwards executed the mortgage sought to be foreclosed *held* to show that the mortgagee really purchased the land as agent for a syndicate to which it was afterwards transferred, and not for itself to be sold to the syndicate.
   [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1361, 1363–1368; Dec. Dig. § 463.*]

6. MORTGAGES (§ 25*)—CONSIDERATION—SUFFICIENCY OF EVIDENCE.
   Evidence in an action to foreclose a mortgage on property purchased in the name of a clerk of the mortgagee, who afterwards executed the mortgage sought to be foreclosed, *held* to show that the mortgagee agreed to purchase the land for $550,000 for a syndicate to be formed for that purpose, taking a $90,000 second mortgage in payment of its services in procuring the property and forming the syndicate, but did not perform any services in consideration of the second mortgage.
   [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 29–42, 1364; Dec. Dig. § 25.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. CORPORATIONS (§ 30*)—PROMOTERS—DUTY TO USE GOOD FAITH.

A land company, which agreed to purchase certain land for a syndicate formed for that purpose, and to take a second mortgage in payment of its commissions and services in forming the syndicate, was required to act in good faith toward the syndicate, and could not make a secret profit out of the transaction.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 97–100; Dec. Dig. § 30.*]

8. MORTGAGES (§ 86*)—EXECUTION—FRAUD.

On the day before a realty company contracted to convey land to a syndicate which it had worked up, for $640,000, it contracted with the executors of the estate which owned it, the vice president of the realty company being one of the executors, to buy it for $350,000, and on the day when it executed a deed therefor to the syndicate and received $129,-570 in cash and a $90,000 second mortgage, over and above a $300,000 mortgage which the realty company gave to the vendor's estate, it received a deed from the estate for $50,000 cash over the mortgage, so that in effect the realty company, without itself expending anything, received a profit of $79,570 in cash and $90,000 mortgage for conveying the land to the syndicate, and has since received some $11,000 more from subscribers to the syndicate. The realty company purchased the land as agent for the syndicate, performing no services in consideration of the $90,000 mortgage executed to it. *Held*, that the $90,000 mortgage executed to the realty company was void, and subject to cancellation for fraud in procuring it.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1350, 1355, 1364; Dec. Dig. § 86.*]

Actions by William M. Crowe and by Harry Harris against the Malba Land Company and others. Judgment as stated.

Elek John Ludvigh (David Leventritt, of counsel), for plaintiffs.
Samuel Evans Maires, for defendant Malba Land Co.
E. H. Westerfield, for defendant New Haven Trust Co.

CRANE, J. On August 6, 1906, the Realty Trust took a deed in the name of one of its clerks, Charles S. Conklin, to a tract of land in Whitestone, Long Island, known as the "Ziegler tract," a part of the Ziegler estate. A $300,000 first mortgage was given to the estate, and a second mortgage of $90,000 executed by Conklin to the Realty Trust. The Realty Trust prior to this had procured a syndicate of Connecticut people to purchase the property, and the $90,000 second mortgage was executed as a part of that transaction. This syndicate at the time had not yet been organized into a corporation, so that title to the property had to be taken in the names of individuals, who in reality were mere agents or trustees for the subscribers. The total amount which this syndicate was to pay for the property, including all expenses, was $640,000, made up of the $300,000 first mortgage above mentioned, the $90,000 second mortgage to the Realty Trust, and the balance in cash. On the said 6th day of August Conklin made a deed of this property to Samuel R. Avis, Noble P. Bishop, and George W. Lewis, the trustees of the syndicate, and the sale thereof, worked up by the Realty Trust, was apparently consummated. Thereafter the syndicate became, through the action of these trustees and others, a Connecticut corporation known as the Malba

Land Company, to which on September 1, 1906, Avis, Bishop, and Lewis conveyed the property. Later was formed the Malba Land Company, a New York corporation, to which, in turn, the Malba Land Company of Connecticut made conveyance by deed of January 10, 1910. This action is brought by the Realty Trust in the name of William M. Crowe, its clerk, to foreclose this $90,000 mortgage, and the question now arises whether the Malba Land Company, a New York corporation, the present owner of the land, can defend upon the ground that the mortgage was obtained through fraud and misrepresentation perpetrated upon the subscribers and their trustees Avis, Bishop, and Lewis by the mortgagee.

[1] There can be no question but what the grantees Avis, Bishop, and Lewis could maintain such a defense as against the Realty Trust, although the deed ran from Conklin subject to said mortgage, as the claim is that the Realty Trust, the mortgagee, was the one who perpetrated the fraud directly upon said grantees, and induced them to take the property subject to said mortgage through false statements regarding its validity. It is not claimed that fraud was practiced upon clerk Conklin, the mortgagor. Lathrop v. Godfrey, 3 Hun, 739. Whether this defense of fraud can also be made by the Malba Land Company of New York depends upon the wording of the deeds of conveyance through which it took title. The deed of September 1, 1906, from Avis, Bishop, and Lewis to the Malba Land Company of Connecticut states that it is subject "to incumbrances of record." The deed of January 10, 1910, of the Malba Land Company of Connecticut to the Malba Land Company of New York states that it is subject "to liens and incumbrances of record." These statements in the deeds are not such a recognition of the Realty Trust's mortgage as to estop the New York Company from setting up the fraud in its origin and procurement.

[2] The rule seems to be that where a grantee takes subject to a mortgage expressly stating and recognizing it either by name or in amount, or else assumes the payment of the mortgage, he is estopped from thereafter attacking it. If, however, he takes the land subject merely to liens and incumbrances thereon, he may show that an alleged mortgage of record is not a valid incumbrance, but is void for fraud. In the following cases the grantee was estopped because he had assumed payment of the mortgage: Johnson v. Parmely, 14 Hun, 398, Parkinson v. Sherman, 74 N. Y. 88, 30 Am. Rep. 268, Ritter v. Phillips, 53 N. Y. 586, Lester v. Barron, 40 Barb. 297, Hartley v. Harrison, 24 N. Y. 170—while in Horton v. Davis, 26 N. Y. 495, Hartley v. Tatham, 26 How. Prac. 158, and McConihe v. Fales, 107 N. Y. 404, 14 N. E. 285, Freeman v. Auld, 44 N. Y. 50, he was estopped because he had taken subject to the mortgage. The leading authority upon this point is Bennett v. Bates, 94 N. Y. 354, which gives the rule as follows:

"The grantee of real estate who by his conveyance assumes the payment of a prior mortgage existing thereon, or takes it expressly subject to such payment, is estopped from controverting the existence and validity of such mortgage. * * * To obtain the benefit of this principle, it is essential that a mortgagee should establish, not only a liability upon the part of the grantor

to himself for the mortgage debt, but also such a contract between the grantor and the grantee as obligates the latter to pay such debt. * * * This doctrine has not, as we have discovered, been extended to conveyances of land subject to a mortgage unaccompanied by covenants for its payment."

The rule also found further expression in Purdy v. Coar, 109 N. Y. 448, 17 N. E. 352, 4 Am. St. Rep. 491, from which the following is taken:

"He contends that Mrs. Coar, the defendant, was merely a purchaser of an equity of redemption, and took subject to the mortgage, and so cannot contest it. The pith of the doctrine is that the circumstances of the purchase amount to an admission of the validity and lien of the outstanding incumbrance. But there was no such admission by Mrs. Coar. She did not take subject to the Walker mortgage, describing or identifying it as such, nor did Marshall as grantee of Coar. The latter's deed contains this language: 'Subject, nevertheless, to all liens of mortgages and taxes thereon.' Acceptance of this deed did not admit that there were any such liens. If they existed, the title was subject to them, but their existence and validity was not conceded."

As the deeds from Avis, Bishop, and Lewis to the Malba Land Company of Connecticut and from the Malba Land Company of Connecticut to the Malba Land Company of New York merely state that the grantees take subject to the incumbrances of record, there is no recognition or admission of the validity of the Realty Trust mortgage any more than there was in the Coar Case, and the New York Company can attack it upon the ground of fraud. These grantees did not assume the payment of the mortgage or take expressly subject to it, but subject only to valid liens and incumbrances, and therefore the present owner, the Malba Land Company of New York, has the same right to defend as Avis, Bishop, and Lewis had.

[3] As the Malba Land Company of Connecticut has transferred its property, it has no further interest in this $90,000 mortgage, and is not a proper party to this action. The motion made by the plaintiff to discontinue as to it should be granted.

It now remains to determine whether or not the evidence shows that the defense of fraud is justified.

[4, 5] The following facts are fully established: That on and prior to June 19, 1906, Charles S. Conklin was a clerk in the office of the Realty Trust as above stated. As fraud pierces through all methods and presents facts stripped of their legal formalities, whatever Conklin did was the act of the Realty Trust. Conklin was the Realty Trust. Anthony M. Clegg was the general superintendent of agents for the Realty Trust, and whatever representations he made were the representations of the Realty Trust. Legally and for this case Clegg was the Realty Trust. William S. Champ was vice president of the Realty Trust, and also one of the executors of the William Ziegler estate; his coexecutors being William J. Gaynor and E. Matilda Ziegler. The Ziegler estate owned a tract of land at Whitestone, Long Island, termed the "Ziegler tract," which in 1905 had been appraised for the executors at $100,000 by certain officers of the Realty Trust. In the spring of 1906 the Realty Trust sent its superintendent of agents, Clegg, to Connecticut to work up a syndicate to purchase this Ziegler tract. Clegg made numerous visits to New Haven, Guilford,

Bridgeport, and other Connecticut towns, and succeeded in procuring over 100 subscribers. He represented that the property could be purchased from the Ziegler estate for $550,000, $300,000 to remain on mortgage, and $250,000 to be paid in cash, and further stated that the Realty Trust would want a second mortgage of $90,000 for its services in procuring the property, obtaining subscriptions to the syndicate and expenses incidental thereto. At a meeting of the subscribers in the Music Hall of New Haven on June 15, 1906, Clegg suggested that three trustees be appointed to take title, and that two more be added to these for the purpose of forming a corporation to take over the property from the trustees. Thereupon Samuel R. Avis, Noble P. Bishop, and George W. Lewis were elected trustees, and David R. Alling and George Maycock were appointed to act with them in forming the corporation. As on July 26, 1906, this committee incorporated the syndicate under the laws of Connecticut in the name of the Malba Land Company, I shall hereinafter refer to the syndicate or the trustees as the Malba Land Company. On June 20th the representatives of the Malba Land Company appeared at the office of the Realty Trust, 60 Liberty street, New York City, and signed a contract with the Realty Trust, agreeing to purchase the Ziegler tract for $640,000, which included the $90,000 to be paid to the Realty Trust for its services as above stated. By August 6th the said Malba Land Company had not been able to raise all of the $250,-000 to be paid in cash, but arranged with the Realty Trust to make up the amount as follows: $129,570 to be paid in cash; $27,400 in promissory notes of subscribers; $93,030 to be subscribed by Clegg and the Realty Trust. A deed of the property was thereupon made by Conklin upon these terms to the syndicate, subject to the Ziegler mortgage of $300,000 and the Realty Trust mortgage of $90,000. The Malba Company paid the $129,570 in cash (which included $25,-000 paid on the signing of the contract), and gave the $27,400 in promissory notes of subscribers, and the subscription of agent Clegg partly guaranteed by the Realty Trust of $93,030. Subsequently some of these notes were paid to the Realty Trust, so that the cash received by it from the Malba Land Company upon this sale amounted in all, as I figure it from the evidence, to $140,795. Eight subscribers have testified in behalf of the Malba Land Company that the representations made to them were that the property was to be bought from the Ziegler estate by the Realty Trust for them at $550,000, $300,000 of which was to be a first mortgage, and that a $90,000 second mortgage was to be given to the Realty Trust.

It is a fact worthy of notice and of much importance that no one testified in behalf of the Realty Trust that there were any negotiations between the Ziegler estate and the Realty Trust for the purchase of this property, except for and on behalf of the Malba Land Company of Connecticut. The Realty Trust claims to have been a bona fide purchaser of this property from the Ziegler estate and to have resold it as a seller, not as an agent, to the Malba Land Company, yet there is no evidence of any negotiations for a sale or of any sale to the Realty Trust until the Malba Land Company syndicate

had been formed to purchase the property as above indicated. The day before the contract was signed with the Malba Company the Realty Trust signed an agreement with the Ziegler estate to purchase the property. The Realty Trust insists that the sale was to the Malba Land Company for $640,000, that no mention was ever made of purchasing the property from the Ziegler estate for $550,000, or any other figure, and that the $90,000 was never stated to be for services or commissions. To meet the testimony of the eight subscribers, as above stated, the plaintiff called Clegg as its only witness bearing upon this part of the case. It must be remembered in reviewing his testimony that he was sent out to sell a large tract of land for a very large price, work up a syndicate to purchase it, and would doubtless be familiar with all details, terms, and conditions, and yet his statement is that he did not know what the $90,000 represented. "Q. Did you know at the time you were endeavoring to procure the subscriptions that there was $90,000 to go to the Realty Trust? A. I did not know what mortgage was going to the Realty Trust. We started out first to obtain $300,000 in cash. Upon Mr. Avis' request, I saw Mr. Demarest, and got Mr. Demarest to agree to increase the mortgage. My subscription paper read mortgages aggregating firstly $340,000, and, secondly, it was changed to $390,000."

Samuel R. Avis testified that, when the contract was closed in the office of the Realty Trust, there were present Mr. Clegg, Mr. Smith, the treasurer, and Mr. Conklin, and that Mr. Demarest was passing back and forth through the office, and that Smith said at that time that the $90,000 mortgage was for commissions and expenses of the Realty Trust in procuring the sale. Mr. Conklin sat in court during the trial, but he was not called as a witness to deny this. Mr. Smith was called, and denied making any such statements, and said that he was out of the city at the time as shown by a diary which he did not produce. Mr. Demarest was not called as a witness to corroborate Smith as to his absence at the time this contract was signed.

Another fact which cannot be overlooked is this: That if the Realty Trust was the vendor of this property to the Malba Land Company for $640,000, and was to be paid over the $300,000 first mortgage and $90,000 second mortgage, $129,570 in cash, $27,400 in notes from subscribers, and the balance of $93,030, through a subscription by its own agent to the enterprise, why should it guarantee the payment of part of this subscription? On June 20th a letter was written to the trustees by Clegg, which reads as follows:

"Realty Trust,
"60 and 62 Liberty Street, Manhattan.
"New York City, June 20, 1906.
"Messrs. Samuel R. Avis, George W. Lewis & Noble P. Bishop, Trustees.

"Gentlemen: In order that you may truthfully report to the gentlemen whom you represent in the syndicate about to purchase what is known as the Ziegler tract at Whitestone, L. I., that the entire subscription list amounting to $300,000 has been filled, I offer to subscribe for whatever balance of said amount has not been subscribed for over and above your present subscription

of $225,000 by August 6th, 1906, and will pay my share of the subscription on or before that date.

"In order that you may be sure of this I have procured the guarantee of Realty Trust which follows.

"Very truly yours,                                                    A. M. Clegg.

"We hereby guarantee the foregoing agreement on the part of Mr. A. M. Clegg.

"Dated, N. Y. June 20th, 1906.                                    Realty Trust.
                                                    "By Wm. C. Demarest, President."

If the Realty Trust were the actual vendor, it could have conveyed this land to the Malba Land Company upon Clegg's subscription without guaranteeing it. It was virtually guaranteeing payment by itself of a debt due to itself. Its general agent promised to pay a part of the price, and it, in turn, promised to give him the money to make the payment. The notes of other subscribers were taken, why was not Clegg's note sufficient? This transaction is more consistent with the theory of the defendant that the Realty Trust was forming a company to buy the property from the Ziegler estate, and represented that it would underwrite part of the subscriptions thereto.

[6] The evidence proves that the Realty Trust agreed to purchase this land from the Ziegler estate for $550,000 and to take a $90,000 second mortgage in payment for its commissions and services and expenses in forming the syndicate.

[7] This being so, the Realty Trust was called upon to act in good faith, and prohibited from making a secret profit out of the transaction.

[8] The fact is beyond dispute that on the day before the Realty Trust made the contract with the Malba Land Company to sell for $640,000 it made a contract with the executors of the Ziegler estate to buy for $350,000, and that on the 6th day of August, 1906, when it gave a deed of the property to the Malba Land Company and received $129,570 in cash and a $90,000 mortgage over and above the $300,000 mortgage, it received on that same day a deed of the property from the executors of the Ziegler estate for $50,000 cash over said mortgage. In other words, it appears that the Realty Trust passed this property from the executors of the Ziegler estate to the Malba Land Company on the same day without putting up one cent of its own, and received in profit $79,570 cash and a $90,000 second mortgage. Since that time it has received $11,025 more from subscribers so that over and above what it paid the Ziegler estate the Realty Trust has received as profit $90,795 cash and a mortgage of $90,000.

The real amount paid to the executors was not discovered until 1912, as their deed to the Realty Trust expressed but $1 consideration. Of course, money was expended by the Realty Trust in helping to form this syndicate, how much does not appear, but this does not save the situation or prevent the fact from being that the Realty Trust bought for $350,000 property which it represented to its customers would cost $550,000. This might have appeared to be good business in the enthusiasm of the rising markets of 1906, but only the cold facts remain after the failure of all expectations.

The conclusion, therefore, is that the debt which this $90,000 mortgage was given to secure was never incurred, and is not owing from the Malba Land Company to the Realty Trust, as it did not perform the services which it was supposed to represent. This mortgage must be declared void and canceled of record. This case is not unlike that of Colton Improvement Co. v. Richter, 26 Misc. Rep. 26, 55 N. Y. Supp. 486.

What has already been stated regarding this $90,000 mortgage applies in its results to the $25,000 mortgage sought to be foreclosed through Harry Harris. At the time this was obtained in February of 1908 the Realty Trust represented that it had no money of the Malba Land Company for development purposes; that that company was indebted to it for interest on $90,000 and for other items. If what I have above stated be correct, it had at that time $90,795 belonging to the Malba Land Company, so that this $25,000 mortgage obtained under these circumstances will also have to be canceled.